15-3487-pr
*Waiters v. Lee*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2016

(Argued: September 13, 2016     Decided: May 22, 2017)

No. 15-3487-pr

_____

GENERAL WAITERS,

*Petitioner-Appellee,*

-v.-

WILLIAM LEE,
Superintendent of Greene Haven Correctional Facility,

*Respondent-Appellant.*

_____

Before:     JACOBS, PARKER, LIVINGSTON, *Circuit Judges.*

Respondent-Appellant appeals from the judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*) granting Petitioner-Appellee's petition for a writ of habeas corpus on the basis of ineffective assistance of counsel.  We conclude, in light of the deferential standard of review, that the state trial court's determination that trial counsel's conduct did not prejudice the defense was not unreasonable.  Accordingly, we VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

1

Judge JACOBS dissents in a separate opinion.

FOR PETITIONER-APPELLEE:　　　MEGAN WOLFE BENETT (Gary Farrell, *on the brief*), New York, NY

FOR RESPONDENT-APPELLANT:　　RHEA A. GROB, Assistant District Attorney (Leonard Joblove, Jodi L. Mandel, *on the brief*), *for* Kenneth M. Thompson, District Attorney of Kings County, Brooklyn, NY

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Petitioner-Appellee General Waiters ("Waiters") got into an argument at the home of his then girlfriend, Jacqueline Warren ("Warren"), one Sunday morning in May 2006 which began, as Warren testified, when she told Waiters that he'd had "too much to drink." Trial Tr. at 399. It ended when Waiters pulled out a revolver and fired repeatedly at Lorenzo, Warren's adult son who had intervened on his mother's behalf, injuring both Lorenzo and Warren's 14-year old daughter, and killing Warren's aunt and her aunt's three-year-old grandchild. Following a jury trial, Waiters was convicted of murder, attempted murder, and assault.

Waiters does not deny engaging in the conduct underlying these crimes. Rather, he contends that his trial counsel was ineffective for failing to call a medical expert both to interpret—and thereby render admissible—the portion of

2

his medical records documenting his blood alcohol level ("BAC"), and to expound upon the effects of that level of intoxication. With that evidence, Waiters contends, it is reasonably likely that the jury would not have concluded that he harbored the requisite intent to commit his crimes. The state trial court judge who presided over Waiters's four-day trial rejected this claim, concluding, *inter alia*, that Waiters had presented nothing "establishing that medical testimony regarding the defendant's level of intoxication would have changed the jury's finding." Appellant's App'x at 55. The district court (Gleeson, *J.*), however, disagreed and granted Waiters's petition for a writ of habeas corpus on this basis.

We vacate the district court's judgment and remand for further proceedings consistent with this opinion. To establish a *Strickland* claim, the likelihood of a different result in the absence of the alleged deficiencies in representation "must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *see also Strickland v. Washington*, 466 U.S. 688, 693 (1984) ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). Here, we cannot say with any assurance how the jury might have weighed the proffered expert evidence of the

3

effects of intoxication on the average person's ability to form intent against Waiters's own specific behavior and statements, including his admission to Warren, about a year after the incident, that he was "*aiming* after" Lorenzo (and thus intending to shoot) because he felt that Lorenzo "was trying to come between" them.   Trial Tr. at 466 (emphasis added).   We are therefore guided by the Supreme Court's instruction that in cases like this one, governed by § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."   *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   Here, the state trial court's determination that Waiters failed to establish prejudice was not unreasonable; it was not so lacking in justification as to be "beyond any possibility for fairminded disagreement."   *Id.* at 103.   The district court accordingly erred in second-guessing that determination and substituting its own judgment for that of the state court.

# BACKGROUND

## I.  Factual Background[1]

### A.  The Offense Conduct

On the afternoon of Saturday, May 6, 2006, Warren threw Waiters a party at her apartment, in which Waiters also resided, to celebrate his 36th birthday.[2] The party was attended by members of Warren's family, including her teenage children Derrick and Shatashia, who lived with Warren; her sister and sister's husband; and her aunt Mary Lee Clark ("Clark") and Clark's five grandchildren, who ranged in age from only a couple of months old to about ten.

Waiters had begun drinking earlier in the day, and had additional Bacardi Light and soda with Warren and Clark during the party.   According to Warren, she and Waiters drank every day; sometimes a fifth of rum managed to last them two days.   Waiters regularly became verbally abusive when he drank, though he did not so behave that afternoon.   The party lasted until about 11:00 p.m., when Warren's sister and brother-in-law left.   Clark and her grandchildren stayed the night.   Warren's 23-year-old son, Lorenzo, a letter carrier with the

---

[1] The factual background presented here is derived from uncontroverted trial testimony except where noted otherwise.

[2] Waiters had lived in Warren's apartment on an "[o]ff and on" basis for four to five years at the time of the shooting.   Trial Tr. at 158–59.

Postal Service who lived at the apartment but did not attend the birthday party, returned home at about 2:00 a.m.

The next day, Waiters was up before 9:30 and went out to purchase cereal and milk for the crowd. Then, before 11:00 a.m., he resumed drinking with Warren and Clark for about half an hour. Shortly thereafter, Warren took the bottle from Waiters, telling him he'd had "too much to drink." Suppl. App'x at 43. Waiters resisted, exclaiming loudly, "Fuck you, bitch," after which an argument ensued. *Id.* at 44. According to Warren, the pair feuded for a period, until Waiters abruptly left the apartment, only to return about 10 minutes later.[3]

Upon his return, Waiters proceeded directly to the couple's bedroom. He remained there for 15 to 20 minutes before reappearing in the living room, now wearing a jacket. By this point, he was "screaming[,]. . . yelling[,] and . . . calling [Warren] names." *Id.* at 46. Clark implored him to calm down. Waiters and Warren exchanged curses before Warren demanded that he leave.

Lorenzo Warren testified that he heard the arguing and came out from his bedroom to the living room to intervene, telling Waiters to "step away from [his]

---

[3] Warren testified that her son, Lorenzo, joined the argument shortly before Waiters left, but Lorenzo did not, in his testimony, distinguish between the periods before and after Waiters's absence from the apartment.

6

mother" and to not "get in [her] face."[4]  *Id.* at 19.  Waiters told Lorenzo that the argument did not "concern" him.  *Id.* at 20.  Lorenzo then moved closer to Waiters, at which point Warren and Clark pushed the two men to opposite ends of the room.

Derrick, then 17, and his younger sister Shatashia, 14, by this time drawn to the living room by the commotion, heard, respectively, Waiters tell Lorenzo, "I got something for you," Trial Tr. at 483, and "you don't want me to pull what I got out of my jacket," *id.* at 309.  Lorenzo nonetheless openly doubted that Waiters had anything in his jacket.  Waiters then pulled out a revolver and pointed it at Lorenzo, who, according to his trial testimony, continued to taunt Waiters, saying, "That gun isn't loaded.  You don't have any bullets in that gun."  Suppl. App'x at 32.

Waiters thereafter rapidly fired multiple shots.  Derrick observed Waiters aim "[s]traight" at his brother, Trial. Tr. at 504, from a distance of about seven or eight feet.  Warren saw Waiters shoot at Lorenzo as "he started going toward where Lorenzo was standing."  *Id.* at 414.  Waiters's first shot hit Lorenzo in the thigh, and the remainder hit Shatashia in the thigh; Clark in the head,

---

[4] Lorenzo testified that Derrick likewise walked in and defended Clark from Waiters's verbal abuse, telling Waiters "not to talk to [his] aunt like that."  Suppl. App'x at 22.

7

abdomen, and leg; and three-year-old Tajmere Clark, who had run out to her grandmother during the tumult, in the head and chest. Clark was rendered comatose and succumbed to her injuries after trial; Tajmere died at the scene.

Waiters thereafter attempted to leave. According to Derrick, who stood between Waiters and the front door, Waiters pointed the gun, a .357 revolver, point-blank at Derrick's face. Waiters then "pulled the trigger." *Id*. at 508. When the gun "clicked," *id*. at 508, indicating to Derrick that it was out of ammunition, Waiters moved toward the exit but Derrick tackled him to the ground and began punching. Lorenzo, though injured, then got on top of Waiters and instructed his brother to leave, all while Waiters continued squeezing the trigger of his gun and "pointing it wildly." *Id*. at 248. Lorenzo began punching Waiters, but Waiters indicated that Lorenzo "wasn't strong enough" and "wasn't causing him any harm," *id.* at 181, asking him, "Is that all you got?," *id.* at 420. Waiters ultimately sustained a concussion after Lorenzo hit him with a fish tank and Derrick hit him with a vase at Lorenzo's instruction, around which time Waiters yelled to Warren for help.

Police and paramedics responded to the scene and transported both Waiters and his victims to the hospital. Medical records introduced at trial

8

noted that Waiters was intoxicated when he arrived at Kings County Hospital Center, and that his "CNS" could not be "assess[ed] due to [his] intoxicated state."[5] Suppl. App'x at 94. Records not before the trial jury but part of the record on appeal indicate that as of 12:33 p.m., approximately an hour after the events in question, Waiters registered an ethyl alcohol level of 386.24, the equivalent of a 0.39 BAC, which the hospital marked as "critical." Appellant's App'x at 76. Waiters was alert on admission, but confused and unaware of the time or where he was. He experienced continued disorientation and reported hallucinations in the days thereafter; hospital staff documented his delirium and history of "alcohol abuse and dependence." Suppl. App'x at 103.

B. The Trial

Beginning on May 5, 2008, General Waiters stood trial in New York Supreme Court, Kings County.[6] In its opening statement, the prosecution explained that it would prove that Waiters, in an alcohol-fueled rage, attempted to shoot and kill Lorenzo Warren, and that he was therefore responsible for all of

---

[5] While not defined in the hospital records, CNS refers to Waiters's central nervous system.

[6] On November 16, 2007, prior to trial, Waiters sought appointment of new counsel, citing, *inter alia*, his attorney's failure to negotiate a plea deal that did not include the possibility of life imprisonment. The state trial court denied the motion.

the resulting injuries—and, at that time, the single fatality[7]—under a theory of transferred intent. Waiters's attorney, Calvin Simons ("Simons"), did not articulate a particular defense in his opening, but he stressed to the jury that Waiters was not charged with intending to kill or injure anyone but Lorenzo: "The issue which you will focus on, as the People have stated, will be Lorenzo Warren." *Id.* at 9.

During the prosecution's case in chief, Lorenzo testified that Waiters appeared drunk during their altercation because his "speech . . . was a little bit slurred." *Id.* at 30. Lorenzo indicated, however, that he had previously seen Waiters intoxicated "around maybe ten" times, *id.* at 27, and that he had been "way worse" on those occasions, *id.* at 30. Derrick testified that Waiters drank during the party the previous evening, as did the other adults, while Shatashia testified that she did not notice whether the adults were drinking, as she "was in a room with the kids." *Id.* at 37.

For her part, Warren testified that Waiters drank on a daily basis, and that it caused him to become verbally abusive. She did not recall, however, how much Waiters had to drink on the day of his party or the next morning, although

---

[7] As noted above, Mary Lee Clark died of her injuries after the trial had concluded.

she testified that she drank with him and with Clark for about half an hour that morning before taking the bottle of Bacardi away.

Warren further testified that about a year after the shootings, in Spring 2007, Waiters telephoned her. During the conversation, Warren asked Waiters why he had done what he did. Waiters explained that "he was aiming after [Lorenzo] . . . [b]ecause he was coming between [them]." Trial Tr. at 421.

At the conclusion of the prosecution's case, Simons indicated that the defense would decide over the weekend whether to call Dr. Sanford Drob as part of the defense case. Dr. Drob was a forensic psychologist engaged by the defense to explore a possible affirmative defense of extreme emotional disturbance. During the pretrial period, Waiters was evaluated by both Dr. Drob and Dr. Alexander Sasha Bardey—a prosecution expert—in connection with this defense, for which Simons had served notice. The prosecution responded by noting that Dr. Drob's testimony might open the door to the admission of a statement made by Waiters to police in the aftermath of the shootings.[8] The trial court advised Simons to "make Doctor Drob aware of the

---

[8] Simons had successfully obtained the pretrial suppression of this statement, which was taken at the Intensive Care Unit at Kings County Hospital on May 8, 2006, a day after the shootings. In the statement, according to police, Waiters indicated, *inter alia*, that Warren's oldest son "was giving him a hard time about how much he had been

11

fact that certainly if he opens the door, and maybe opening a door to a can of worms, that would not be helpful to your client." *Id.* at 524. It then recessed for the weekend.

The following Monday, Simons informed the trial court that Waiters did not want Dr. Drob to testify. Waiters confirmed that proposition, and further indicated that he did not wish to testify on his own behalf. Simons thereafter sought to introduce certified medical records of Waiters's hospital visit in support of the argument that Waiters was intoxicated and unable to form intent. The prosecution objected, arguing primarily that the evidence already indicated that Waiters was drinking, intoxicated, and suffered a head injury; that the hospital records would invite speculation absent an explanation of the terms contained therein; and that introducing them might open the door to evidence that General Waiters, "in talking to both Doctor Drob[] and Doctor Bardey, said that he hadn't been drinking that morning, was not intoxicated, and was able to

---

drinking," after which Waiters went into the bedroom and retrieved a gun. Nov. 17, 2011 Tr. at 17. He began to fire, according to his account of the incident, when "Jackie's son started to come at him down the hallway," after which Lorenzo, assisted by Derrick, "got on top of him [and] started stomping" until he passed out. *Id.* at 17–18.

give a coherent version, his coherent version about what had happened."[9]

Suppl. App'x at 66. The trial court ultimately admitted two redacted pages of

the medical records which together indicated, as previously stated, that Waiters

arrived at the hospital in an intoxicated state and that hospital staff could not

evaluate his "CNS" as a result. The trial court found that all other parts of the

medical record "would not be [relevant] without an explanation by medical

personnel."[10]   *Id.* at 73. Simons took exception to the redaction, but rather than

seek an adjournment to obtain a medical expert, he indicated that the defense

---

[9] Dr. Drob's report indicates that Waiters claimed that Lorenzo threatened to kill him on the morning of the shootings, causing Waiters to fear for his life and to go "to the bedroom and [get] his gun." Sanford L. Drob, Preliminary Forensic Psychological Evaluation 4–5 (Sept. 24, 2007), ECF No. 37. Waiters shot at Lorenzo, he told Dr. Drob, to scare him, after Lorenzo allegedly said, "I'll kill you now." *Id.* at 5. Waiters indicated that he shot Tajmere Clark accidentally, after which he "fired another shot at Lorenzo and hit him in the leg." *Id.* at 4–5. Waiters indicated that he was not drunk that morning, but that he was hung over. *Id.* at 6. Dr. Drob concluded that "there [was] little to suggest that Mr. Waiters was either unaware of the nature of his act or unable to appreciate its wrongfulness." *Id.* at 23. Waiters's statements to Dr. Bardey similarly suggested that Waiters was aware of his actions that day, and picked up, pointed, and shot a gun at Lorenzo Warren to scare him. *See* Alexander Sasha Bardey, Forensic-Psychiatric Evaluation 7, 15 (Oct. 9, 2007), ECF No. 37.

[10] The dissent contends that the state trial judge "urged defense counsel to call an expert" and "went as far as she could go without committing advocacy." Yet the record indicates that the trial judge, the very judge who later found that Simons's performance did not prejudice Waiters's defense, was not commenting on the *probative value* of the hospital records, but rather was suggesting that the best way to render them *admissible* was to call an expert to interpret them. *See, e.g.,* Suppl. App'x at 68 ("[T]he best way would have been to get someone from the hospital to certainly interpret the records . . . .").

13

was "prepared to go forward" without the full medical records being admitted.[11] *Id.* at 73.

In his summation, Simons argued that Waiters was so intoxicated that he did not intend to kill Lorenzo, but rather was merely reckless. He attempted to cast doubt on the testimony of Warren and her family suggesting the contrary by emphasizing discrepancies and omissions in the various witness accounts. He noted, among other things, that Waiters started drinking again that morning; that the medical records indicated that he was intoxicated; that multiple witnesses testified that Waiters changed when he drank; and that Waiters continued to pull the trigger on his revolver even after he had discharged all of its bullets. Simons also attacked the credibility of Warren's testimony about Waiters's phone call in Spring 2007, noting that she did not immediately mention the call to the prosecutor, even though she had "already talked to the District Attorney in the case." Trial Tr. at 607–08.

---

[11] The prosecution thereafter suggested that the state trial court's determination to admit even the redacted pages rendered it "relevant and admissible to call either Doctor Drob or Doctor Bardey," Suppl. App'x at 73, given that Waiters "gave accounts to both [doctors] in which he talk[ed] about [the fact] that he clearly knew what was going on and that he had a specific intent," Trial Tr. at 555. The defense objected, and the trial court, without explicitly addressing whether Waiters had opened the door, determined that it would admit the redacted records over the prosecution's objection.

14

In response, the prosecution also focused on Waiters's intent, noting that Waiters was able to perform the physical acts necessary to commit his crimes, and that his use of the gun—and specifically the fact that he targeted and successfully shot Lorenzo, "track[ing] over to" follow him as Lorenzo moved across the apartment—suggested that he was able to intend, and did intend, to kill. *Id.* at 629.

The prosecution likewise argued that, while Waiters "drank seriously every day," *id.* at 633, and was voluntarily intoxicated that morning, the witness testimony suggested he was not so severely intoxicated that he was unable to form intent. Indeed, the prosecution explained that Waiters bought cereal and milk that morning; argued with Warren about his drinking; obtained a revolver and hid it in his jacket; argued with and ultimately shot Lorenzo; and attempted to escape the apartment after exhausting his ammunition. Moreover, Waiters's phone call to Warren, the prosecution contended, clearly demonstrated that he formed the requisite intent to commit his crimes: "[I]f he's so blown out, if he is so, so soused that he can't form intent . . . when Jackie asked him 'Why did you do it?' he would have said, 'Honey, I don't know.' But he doesn't." *Id*. at 642. Instead, the prosecution maintained, General Waiters *admitted* that he intended

15

to shoot Lorenzo "to eliminate him for coming between" Waiters and Warren. *Id.* at 642.

Thereafter, at Simons's request, the state trial court: (a) instructed the jury on the relevance of intoxication evidence, describing how it can serve to negate the intent element of the crimes with which Waiters was charged, and (b) instructed the jury on manslaughter in the first degree, as a lesser–included charge of second degree murder.   Thereafter, on May 13, 2008—the same day on which deliberations began—the jury found Waiters guilty of one count of murder in the second degree, in violation of New York Penal Law § 125.25(1); one count of attempted murder in the second degree, in violation of New York Penal Law §§ 110.00 and 125.25(1); and two counts of assault in the first degree, in violation of New York Penal Law § 120.10(1).   The trial court ultimately sentenced Waiters to consecutive sentences of 25 years to life for second-degree murder, 10 years for second-degree attempted murder, 25 years and five years for each of the assault counts, respectively, and five years of post-release supervision.

## II. Post-Trial Proceedings

Waiters filed both a *pro se* motion to vacate his conviction under New York Criminal Procedure Law § 440.10(1)(h) (the "440.10 motion") and, with the assistance of counsel, a direct appeal. In his 440.10 motion, Waiters maintained that Simons was constitutionally ineffective for failing to call an expert witness to interpret his hospital records and testify about his intoxication, and for not requesting that the trial court charge the jury on second-degree manslaughter.[12] On January 26, 2011, the state trial court denied Waiters's 440.10 motion as procedurally barred, concluding that sufficient facts appeared on the face of the record to permit review of his claims on direct appeal. The New York Supreme Court Appellate Division – Second Judicial Department ("Appellate Division") denied leave to appeal.

Waiters thereafter filed a *pro se* supplemental brief in his direct appeal, dated February 4, 2011, alleging ineffective assistance of counsel for the same reasons as those identified in his 440.10 motion. On May 8, 2012, the Appellate Division modified Waiters's sentence by directing that portions of it run concurrently, but otherwise rejected Waiters's appeal. *See People v. Waiters*, 95

---

[12] Unlike first degree manslaughter, which requires a specific intent "to cause serious physical injury to another person," N.Y. Penal Law § 125.20(1), second degree manslaughter entails a *mens rea* of only recklessness, *see* N.Y. Penal Law § 125.15.

A.D.3d 1043, 1044–45 (2d Dep't 2012).   The Appellate Division determined that

Waiters's ineffective assistance of counsel claim could not be resolved "without

reference to matter outside the record," such that it was, in fact, appropriately

raised in a 440.10 motion.   *Id.* at 1044–45.   The New York Court of Appeals

denied leave to appeal.   *People v. Waiters*, 19 N.Y.3d 1002 (2012).

A year later, on June 26, 2013, Waiters filed a *pro se* habeas petition in the

United States District Court for the Eastern District of New York under 28 U.S.C.

§ 2254(d), alleging, once again, that Simons was constitutionally ineffective for

the same reasons as those identified in his 440.10 motion.   On November 5,

2013, the district court (Gleeson, *J.*) appointed counsel and stayed the case to

permit Waiters to exhaust his claims through a renewed 440.10 motion.   The

state trial court thereafter held an evidentiary hearing on Waiters's renewed

440.10 motion on May 28 and 29, 2014—six years after Waiters's trial—at which

Waiters called Dr. Richard Stripp, a forensic toxicologist, and Simons, his trial

attorney.[13]

Dr. Stripp testified that Waiters's BAC of 0.39 was "significantly elevated,"

Appellant's App'x at 75, and that it meant that Waiters had consumed sixteen

---

[13] Waiters's renewed 440.10 motion included an additional theory of ineffectiveness, namely Simons's failure to impeach Warren with prior inconsistent statements.

alcoholic drinks that morning, or even more if his drinking was spread over a longer period of time.[14]   Dr. Stripp further opined that an average person with such a high BAC would suffer "motor impairment" and "significant cognitive impairment," *id.* at 81, including compromised judgment and emotional instability, blackouts, and amnesia.

Dr. Stripp also recognized, however, that there is "very significant individual[] variation" in how individuals are affected by alcohol, such that tolerance is "one of the most important considerations when interpreting a blood alcohol concentration." *Id.* at 68.   Accordingly, he explained that a "very tolerant drinker [can] have some level of functioning" when intoxicated, *id.* at 82, such that the effects of intoxication—be they physical or mental, which Dr. Stripp explained do not always manifest in tandem—may be reduced by as much as half.   In fact, Dr. Stripp indicated that he had seen individuals with very high BACs who were, despite exhibiting poor *judgment*, still able to form *intent*.

Based on the medical records, Dr. Stripp noted that while hospitalized in the aftermath of the shootings, Waiters suffered from delirium and hallucinations caused by alcohol withdrawal which, together with abnormal

---

[14] Dr. Stripp also indicated that Waiters's BAC "could have been slightly higher, . . . at that level[,] or even slightly lower" at the time of the incident. Appellant's App'x at 76.

liver function, suggested that Waiters had a long-term alcohol problem and consumed large quantities on a daily basis. Therefore, and given the aforementioned "significant variation" in individuals' alcohol tolerance, *id.* at 89, Dr. Stripp concluded that while Waiters's "[d]efinite[]" drunkenness affected his "functioning and judgment," *id.* at 95, 102, Dr. Stripp could not opine on how tolerant Waiters was, or on what effect his intoxication may have had on his ability to form intent.[15]

Simons, in his testimony, explained that he sought and obtained a subpoena for Waiters's hospital records within two weeks of his first appearance in the case.[16] Simons and his client initially planned on pursuing an extreme emotional disturbance defense and calling both Dr. Drob and Waiters to support it, but Simons became concerned about the defense's viability before trial, and it was ultimately not pursued.[17] Simons further represented that Waiters, on the

---

[15] Dr. Stripp also confirmed that some of the symptoms that Waiters exhibited upon admission to the hospital may have been attributable to his head injury.

[16] In reviewing the records, Simons had the assistance of family members—an internist, a trauma surgeon, and a registered nurse—and, to the best of his recollection, a defense investigator with medical training.

[17] In a letter to his client written in October 2007, over six months before trial, Simons indicated that the defense, which was apparently predicated on Waiters's supposed reaction to Lorenzo Warren's allegedly threatening conduct, would be difficult given that none of the witnesses stated that Lorenzo threatened Waiters. As Simons put it to Waiters in the pretrial period, Waiters's testimony might constitute

day of his scheduled testimony, decided not to take the stand, despite Simons advising him to do so.

Sometime after the close of the prosecution's case, the defense settled on an intoxication-based theory and, to that end, Simons sought to introduce Waiters's full hospital records. Simons indicated that he discussed the significance of Waiters's blood alcohol level with his client "a lot," but that the "problem" was that when he asked Waiters about his 0.39 BAC, Waiters told him—consistent with his statements to Dr. Drob and Dr. Bardey—that he was not drunk, and that while he "drank the night before," on the morning of the shootings he "did not feel drunk at all." *Id.* at 132. Further, according to Simons, Waiters consistently represented that he fired at Lorenzo to "scare him or . . . hit him in the leg," *id.* at 182, the same explanation he had provided to the experts. Simons ultimately did not offer a strategic reason for not calling a medical expert, claiming he could no longer remember what he was thinking, though he affirmed he was pursuing a strategy in Waiters's best interest.

Following the hearing, on October 14, 2014, the state trial court denied Waiters's renewed 440.10 motion, finding that Simons's failure to call a medical

"the only evidence of a [threat] and if a jury does not believe you then you will probably be convicted." Letter from Calvin J. Simons to General Waiters (Oct. 25, 2007), ECF. No. 37.

expert to explain Waiters's medical records and BAC amounted to a permissible "mere tactical decision" under *Strickland*. *Id.* at 55. The trial court explained that "[t]he defendant's intoxicated state was explored before the jury," and that, more generally, "the defendant's expert, Dr. Stripp . . . could not establish that the defendant's blood alcohol level was such that his intent to commit the crime was negated." *Id.* at 55. The trial court accordingly determined that while Simons could have called an expert to explain the medical records, "[p]articularly in light of the defendant's claims that he was not intoxicated at the time of this incident," the failure to do so "under the particular facts and circumstances of [the] case" did not constitute ineffective assistance. *Id.* at 55. Simons, the trial court also noted, was placed "in the untenable position of setting forth a theory which was not consistent with the defendant's own position," namely that he was not intoxicated. *Id.* at 55. Thus, for each ineffectiveness contention "there [were] equally plausible explanations why trial counsel proceeded in the manner which he did at the time of the trial." *Id.* at 55.

As to prejudice, the state trial court first observed that Waiters's intoxicated state and its impact on the defendant's capacity to form intent had been considered and rejected by the jury, and that expert evidence would not

likely have influenced this result given that "Dr. Stripp established [that while] the defendant had a particularly high blood alcohol level . . . the effects of [that level] could vary greatly depending on the defendant's tolerance." *Id*. at 55. There was otherwise "no testimony presented which established that medical testimony regarding the defendant's level of intoxication would have changed the jury's finding." *Id.* at 55. Accordingly, the trial court concluded that while Simons could have called an expert, "his failure to do so [did] not rise to the level of a course of conduct which was inexplicably prejudicial."[18] *Id.* at 55. The Appellate Division again denied leave to appeal.

Waiters thereafter returned to district court. The district court lifted the stay, ordered additional briefing, and held oral argument on Waiters's habeas petition on July 24, 2015. On September 25, 2015, the district court granted Waiters's petition for a writ of habeas corpus, finding the state court's rejection of his 440.10 motion to be "an unreasonable application of the *Strickland* standard," *id.* at 24, and ordering Waiters's release within 45 days. The district court also denied the State's application for a stay pending the appeal. The State thereafter filed an application for a stay in this Court, and on April 5, 2016, we

---

[18] The state trial court also rejected Waiters's other ineffective assistance claims stemming from Simons's decision not to impeach Warren with prior inconsistent statements, and not to seek a charge of second-degree manslaughter.

23

granted the application and stayed Waiters's release indefinitely pending this panel's resolution of the appeal.

## DISCUSSION

## I

The Supreme Court in *Strickland* set forth a two-part test for evaluating claims of ineffective assistance of counsel. To warrant relief, a defendant must demonstrate both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."[19] *Strickland*, 466 U.S. at 687; *accord Fischer v. Smith*, 780 F.3d 556, 559 (2d Cir. 2015). "Without proof of both deficient performance and prejudice to the defense," the Supreme Court has said, it cannot be shown that the conviction "'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,'" and the conviction "should [therefore] stand." *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Strickland*, 466 U.S. at 687). We review the district court's grant of a

---

[19] The habeas petitioner must satisfy both prongs, and at all times "bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights [were] violated." *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (quoting *Epps v. Poole,* 687 F.3d 46, 50 (2d Cir. 2012)); *see also Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) ("[T]he burden rests on the accused to demonstrate a constitutional violation." (alteration in original) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984))).

24

petition for habeas corpus *de novo*, and its underlying findings of fact for clear error. *Ramchair v. Conway*, 601 F.3d 66, 72 (2d Cir. 2010).

Under AEDPA, when a state court adjudicates a petitioner's habeas claim on the merits, a district court may only grant relief where the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). AEDPA by its terms requires substantial deference to the state court's decision in all cases governed, as here, by § 2254(d).[20] *See Cavazos v. Smith*, 565 U.S. 1, 9 (2011) (per

---

[20] Indeed, the Supreme Court has indicated that *double deference* is appropriate when evaluating *Strickland* claims governed by § 2254(d). *See, e.g., Knowles v. Mizrayance*, 556 U.S. 111, 123 (2009). Whether such heightened deference applies to both prongs of a *Strickland* claim, or only to the ineffective assistance prong, remains an open question in this Circuit. The Supreme Court has suggested that double deference is appropriate as to both prongs, *see Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) (distinguishing two Supreme Court cases because the "Court did not apply AEDPA deference to the question of prejudice in those cases; each of them lack the important 'doubly deferential' standard of *Strickland* and AEDPA"), but the Circuits that have ruled on the issue are split, *compare Hardy v. Chappell*, 849 F.3d 803, 825 n.10 (9th Cir. 2016) (explaining that "a case considering only [the prejudice] prong is not subject to double deference"); *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333 (11th Cir. 2013) ("[D]ouble deference does not apply to the prejudice inquiry.") *with Foust v. Houk*, 655 F.3d 524, 534 (6th Cir. 2011) ("We therefore afford double deference . . . on both prongs of the *Strickland* test."); *Elmore v. Ozmint*, 661 F.3d 783, 876 (4th Cir. 2011) (Wilkinson, *J.,* dissenting) (observing that "courts regularly apply the 'doubly deferential' standard of *Strickland* and AEDPA to both the performance and prejudice prongs," and describing that practice as "mak[ing] good sense"). We need not resolve the question here

25

curiam) (noting "the necessity of deference to state courts in § 2254(d) habeas cases").

The operative question in reviewing a state court's *Strickland* ruling is thus "not whether a federal court believes the state court's determination was incorrect[,] but [rather] whether that determination was [objectively] unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2006); *accord Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *see also Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000) (explaining that, for application of a clearly established federal law to be unreasonable, the state court must not merely have erred, but rather its actions must be "somewhere between 'merely erroneous and unreasonable to all reasonable jurists'" (quoting *Francis S. v. Stone*, 221 F.3d 100, 109 (2d Cir. 2000))). Accordingly, to justify relief, Waiters was required to establish "that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *accord Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012).

---

because the application of AEDPA deference alone is sufficient to conclude that vacatur is the proper course.

Because this appeal can be resolved with reference to *Strickland's* prejudice prong alone, we assume, without deciding, that there was no strategic rationale for Simons's decision not to call a medical expert. To be clear, however, the fact that Simons no longer remembers his reason for this decision does not preclude a determination that Waiters failed to establish constitutionally defective representation. The state trial judge noted that for each argument raised by Waiters supposedly demonstrating his counsel's ineffectiveness, "there [were] equally plausible explanations why trial counsel proceeded in the manner which he did at the time of the trial." Appellant's App'x at 55. We see no reason to disagree.[21] But, as the Supreme Court explained in *Strickland* itself, "[t]he object

---

[21] As the state court noted, while Waiters's repeated insistence to Simons, Dr. Drob, and Dr. Bardey that he was aware of his actions and intended to shoot at Lorenzo did not preclude his attorney from calling a medical expert, Waiters's statements were nonetheless relevant to the question whether Simons provided constitutionally ineffective assistance in electing not to call one. *See Nix v. Whiteside*, 475 U.S. 157, 165 (1986) (stressing courts "must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct," and noting that "the Sixth Amendment inquiry is into whether the attorney's conduct was 'reasonably effective'"). Indeed, the prosecution suggested at trial that introducing medical evidence of Waiters's level of intoxication would open the door to the admission of Waiters's statements to the doctors—evidence that would have been devastating to the defense. *See People v. Rodriguez*, 134 A.D.3d 512, 513 (1st Dep't 2015) (concluding that the defendant "was not deprived of effective assistance by counsel's decision" not to put on evidence that might have opened the door to the defendant's incriminating admissions); *see also People v. Fardan*, 82 N.Y.2d 638, 646 (1993) (explaining that "when the defendant or a witness for the defense testifies to facts that are in conflict with . . . precluded evidence," the

27

of an ineffectiveness claim is not to grade counsel's performance" so that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." 466 U.S. at 697; *accord Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991). We conclude that the state court did not unreasonably apply *Strickland* in determining that Simons's conduct was not prejudicial, *i.e.*, in finding that Waiters failed to demonstrate that it was reasonably likely that calling a medical expert would have changed the outcome of his trial.[22] *See Carrion*, 549 F.3d at 588 (noting that a petitioner must

---

defense "'opens the door' on the issue in question"). Moreover, seeking an adjournment to obtain a medical expert would have afforded the prosecution time to seek additional evidence concerning Waiters's capacity to form intent. The record does not permit a conclusion regarding why exactly Simons chose not to call an expert. The existence of plausible explanations, however, bears on the question (which we need not resolve) whether Waiters satisfied his burden of establishing *Strickland*'s first prong—that Simons's performance was deficient. *See Cardoza*, 731 F.3d at 178 (noting petitioner's "ultimate burden" of establishing that his rights were violated).

[22] The dissent maintains that the state trial court's ruling on prejudice is ambiguous and therefore unworthy of deference. We disagree. The dissent relies on a single sentence at the conclusion of the trial court's decision, which states that "having viewed the evidence first hand, there is a little doubt the claims raised by the defendant would have served to change the jury's verdict." Appellant's App'x at 56. Read in context, however, the trial court plainly did not intend to suggest the existence of prejudice, but rather inadvertently added an "a" and omitted a "not" (emblematic of several other typos in its opinion). Thus, earlier in the decision, the trial court clearly affirmed that "Dr. Stripp, called for the purpose of this hearing, could not establish that the defendant's blood alcohol level was such that his intent to commit the crime was negated." *Id.* Further, in the sentences that immediately precede the offending clause, the district court made clear that "[t]rial counsel's conduct did not constitute egregious or prejudicial conduct. . . . The evidence presented establish[ed] the

28

"'affirmatively prove prejudice arising from counsel's allegedly deficient representation'" (quoting *United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005))).

Accordingly, the district court erred in holding otherwise and in granting habeas relief.

## II

### A. Waiters's Burden

To establish prejudice under *Strickland*, a habeas petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[23]  *Greiner v.*

---

defendant received a fair trial with the benefit of effective representation."  *Id*. Indeed, even the district court recognized that the trial court "found there was no testimony establishing that medical testimony about Waiters's level of intoxication would have changed the jury's finding."  *Id.* at 15.  With respect, the dissent obfuscates the record.

[23] Puzzlingly, the dissent relies on *Brady v. Maryland*, 373 U.S. 83 (1963), and not on *Strickland*, to argue its case, apparently on the theory that if the prosecution had *suppressed* the medical evidence, we would surely agree that prejudice had been established.  But the prosecution did not suppress the evidence, and so this is not a counterfactual we need (or should) address.  The *Strickland* prejudice inquiry partly "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution."  *Strickland*, 466 U.S. at 694.  But the dissent errs in concluding that *Brady* and *Strickland* prejudice are, as a result, necessarily identical in their application.  As our learned predecessor astutely observed, "words are chameleons, which reflect the color of their environment," *Commissioner v. Nat'l Carbide Corp.*, 167 F.2d 304, 306 (2d Cir. 1948) (L. Hand, *J.*), such that "identical language may convey varying content," *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015).  Thus, rather than look to a body of case law separate from that which governs the claim at issue here, we conclude that under well-established precedent specific to

29

*Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 694); *see also Strickland*, 466 U.S. at 687 (explaining that the deficient performance must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable").

"A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, and thus the chance of an alternate result must be "'substantial,' not just 'conceivable,'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Richter*, 562 U.S. at 112); *see also Strickland*, 466 U.S. at 693 (explaining that the required level of prejudice falls between the deficiencies having "some conceivable effect" and "more likely than not alter[ing] the outcome in the case"). Moreover, we have said that where a conviction is "supported by overwhelming evidence of guilt," habeas relief on the ground of ineffective assistance is generally not warranted. *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001); *see also United States v. Hasan*, 586 F.3d 161, 170 (2d Cir. 2009) (denying habeas relief on this basis). This is because a verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than "a verdict or conclusion only weakly supported by the record." *Strickland*, 466 U.S. at 696.

---

*Strickland*—and particularly to claims raised in a § 2254(d) petition—the state trial court's determination that Simons's conduct did not prejudice Waiters's defense was not objectively unreasonable.

30

Waiters's theory of prejudice hinges on New York Penal Law § 15.25, which provides that "evidence of intoxication of the defendant may be offered whenever it is relevant to negative an element of the crime charged." Intoxication, however, "is not, as such, a defense to a criminal charge," *People v. Sirico,* 17 N.Y.3d 744, 745 (2011) (quoting N.Y. Penal Law § 15.25), and "the general rule is that an intoxicated person can form the requisite intent to commit a crime," *People v. Alston*, 42 A.D.3d 468, 469 (2d Dep't 2007) (quoting *People v. LaGuerre*, 29 A.D.3d 820, 822 (2d Dep't 2006)).[24] Under New York law, "it is for the trier of fact to decide if the extent of the intoxication acted to negate the element of intent." *Id.* (quoting *LaGuerre*, 29 A.D.3d at 822). And while a "relatively low threshold" exists to demonstrate entitlement to an intoxication *charge*, even a charge may not be warranted, despite the defendant's substantial use of intoxicants at the time of an alleged crime, where "the uncontradicted record evidence . . . supports the conclusion that his overall behavior on the day of the incident was purposeful." *Sirico*, 17 N.Y.3d at 746; *see also People v. Beaty*, 22 N.Y.3d 918, 921 (2013) (noting no intoxication charge was warranted, even

_____

[24] The question is thus not, as the dissent suggests, whether Waiters was *extremely* intoxicated, whether his intoxication affected his *aim*, or even whether he had a *diminished* ability to form the requisite intent. Rather, it is whether, with the benefit of the disputed evidence, there is a reasonable probability that the jury would have found that Waiters's intoxication rendered his actions *unintended.*

though the defendant might have consumed alcohol before committing the crimes alleged, where "the evidence established that [the] defendant's conduct was purposeful").

All the charges of which Waiters was found guilty required specific intent. *See* N.Y. Penal Law §§ 125.25(1) (requiring "intent to cause the death of another person"), 110.00 (requiring "intent to commit a crime"), 120.10(1) (requiring "intent to cause serious physical injury to another person").[25] Waiters thus contends that there is a reasonable probability that, but for his attorney's allegedly deficient performance—as is relevant here, Simons's failure to call a medical expert—the jury would not have found that Waiters harbored the requisite intent to commit his crimes. He further contends, as he must, that the state court's conclusion to the contrary was sufficiently unreasonable such that "there is no possibility fairminded jurists could disagree." *See Richter*, 562 U.S. at 102. For the following reasons, Waiters is incorrect.

---

[25] The charge of criminal possession of a weapon in the fourth degree, which the jury did not reach, did not require specific intent. *See* N.Y. Penal Law § 265.01(1); *People v. Parrilla*, 27 N.Y.3d 400, 405 (2016) (indicating that a defendant "need only knowingly possess a firearm" to violate the statute).

32

B.    Underline Application

At the close of Waiters's trial, based on both witness testimony and the two redacted pages of medical records that the district court admitted, the jury was well aware that Waiters had been drinking both during his birthday party and the following morning, and that he was intoxicated when he emptied his revolver in the direction of Warren's family. The jury was also privy to evidence indicating that Waiters's intoxication had not rendered him incapable of purposeful action, including testimony documenting his actions and conversations on the morning of the incident, and his subsequent admission to Warren that he had targeted Lorenzo because Lorenzo was "coming between" them. Trial Tr. at 421. On the basis of this evidence, while the jury was instructed on intoxication, it found Waiters guilty of murder, attempted murder, and assault.

We are not persuaded that, had the jury also heard from a medical expert and reviewed the full set of medical records, there is a sufficiently strong probability that it would have found differently such that the state trial court's determination to the contrary was unreasonable. While such evidence could have been proffered, it would not likely have made a difference in light of the

33

strong, specific testimonial evidence indicating that Waiters formed the requisite intent to commit his crimes.   *See Strickland*, 466 U.S. at 696; *Lindstadt*, 239 F.3d at 204.

Dr. Stripp's testimony and the medical records offer support for two propositions.   First, they demonstrate that Waiters was intoxicated and had a BAC of 0.39, which the hospital deemed "critical," Appellant's App'x at 76—and which was potentially life threatening—approximately an hour after the incident. Second, Dr. Stripp's testimony establishes that a 0.39 BAC causes significant physical and mental impairment in the *average* person, and of a sort associated with the incapacity for purposeful conduct (encompassing, for instance, blackouts and amnesia).

However, the critical deficiency of this evidence—a deficiency which the dissent notably omits to discuss—is that it does not establish how the 0.39 BAC affected *Waiters* and, more specifically, whether it undermined *his* ability to form intent.   As Dr. Stripp testified, there is "very significant individual[] variation" among individual responses to alcohol because of variances in tolerance, which is "one of the most important considerations when interpreting [BAC]."   *Id.* at 68.   For this reason, Dr. Stripp made clear that he had no opinion as to whether

Waiters could have formed intent and that he could not say "when an individual along the continuum of blood alcohol content los[es] the ability to form intent." *Id.* at 89. Indeed, a "very tolerant drinker [can] have some level of functioning" when intoxicated, *id.* at 82, to the extent that an individual with a very high BAC can, despite bad *judgment*, still form specific *intent*.

The evidence here suggests that Waiters possessed such tolerance. Warren testified that Waiters drank every day—behavior that Dr. Stripp explained results in alcohol tolerance—and Lorenzo maintained that he had seen Waiters intoxicated "maybe ten" times, Trial Tr. at 208, and that Waiters was much *more* intoxicated on those days than he was during the incident. The full medical records likewise indicate that Waiters had a history of "alcohol abuse and dependence," Suppl. App'x at 103, consistent with Dr. Stripp's testimony regarding Waiters's delirium, hallucinations, and abnormal liver function.

Further, to the extent that Waiters's BAC has remaining significance, even given that Waiters habitually abused alcohol and that Dr. Stripp could not opine on the question whether Waiters's intoxication negated *his* ability for purposeful conduct, it is still overshadowed, in this case, by the specific testimonial evidence of Waiters's ability to carry out purposeful acts prior to, and during, the incident.

That morning, Waiters (a) purchased cereal and milk for Warren's family, an errand which necessarily involved purposeful travel and conducting a transaction; (b) argued with Warren when she took a bottle of alcohol from him; (c) obtained a revolver and had the presence of mind to hide it under a jacket; (d) argued with, and taunted, Lorenzo while making oblique references to his gun; (e) aimed and fired his revolver at Lorenzo, striking him in the thigh; (f) put his gun to Derrick's head and pulled the trigger; (g) attempted to flee the scene; (h) continued taunting Lorenzo while he struggled with him on the floor; and (i) asked Warren for help during that struggle. Collectively, these actions tend strongly to demonstrate that Waiters retained the ability to identify a conscious purpose and to act on that purpose, the intent necessary for conviction. *Cf. Beaty*, 22 N.Y.3d at 921 (finding that an intoxication charge was not warranted because evidence that the defendant "cut a hole in a screen to gain entry [into a house], instructed the victim to be quiet, threw a blanket over her head, and stole her cell phone so she could not call the police" had "established that [the] defendant's conduct was purposeful"); *People v. Saavedra*, 39 A.D.3d 316, 317 (1st Dep't 2007) (concluding that the "[d]efendant's intent to cause serious physical injury could be readily inferred from his actions, and there was no evidence that

he was so intoxicated as to be unable to form the requisite intent" where the defendant "observed his friend fighting with [an] unarmed victim, [and thereafter] went to his car and obtained a knife with which he repeatedly stabbed the victim in the back" (citation omitted)).

Waiters's own description of the events of that morning corroborates this understanding of his mental state. According to Warren, Waiters admitted in a Spring 2007 phone call that he was "aiming after" Lorenzo because Lorenzo was "coming between" them. Trial Tr. at 421. Waiters appears, moreover, to have reported to Dr. Drob and to Dr. Bardey both that he retrieved his weapon and shot it intending to scare Lorenzo Warren because Waiters felt threatened, and that he did not feel intoxicated that morning at all.[26] The evidence thus strongly suggests that Waiters had the ability to form the requisite intent to commit his crimes. *Cf. People v. Natal*, 100 A.D. 3d 509, 509 (1st Dep't 2012) (finding that the defendant's "oral and videotaped post[-]arrest statements, as well as the observations of the responding police officers," "supported the trier of fact's

---

[26] As noted above, while Dr. Drob and Dr. Bardey were not called at trial, the record suggests that, were the full medical records admitted through the testimony of a medical expert, the prosecution would have sought to introduce evidence of Waiters's statements to the doctors.

determination that although intoxicated, [the] defendant had the intent to cause serious physical injury when he stabbed the victim in the chest").

In reaching a different conclusion, the district court relied heavily (as the dissent does) on the theory that evidence of Waiters's BAC and its possible effects would have enabled Simons to "fend off" the prosecution's summation argument that there was no evidence indicating that Waiters was *so* intoxicated that he could not form the requisite intent.   Appellant's App'x at 23.   While the evidence in question would certainly have supported a response to *this* prosecution argument, however, it does nothing to reduce the persuasiveness of other central elements in the prosecutor's closing, including Warren's testimony that Waiters admitted to her that he purposefully shot at Lorenzo.   As recounted by the prosecution in summation, Waiters admitted to Warren, in "'black and white," that he "wanted to eliminate [Lorenzo] for coming between [them]."   Trial Tr. at 642.   Moreover, we also do not presume that the prosecution's summation would have been identical had Simons introduced the medical evidence on which Waiters relies.   Rather, the prosecution would, in that scenario, have emphasized the remaining evidence in the record—evidence that, in any event, the prosecution *did* reference in its summation—which offered

38

substantial and unrebutted support for the proposition that Waiters *did* intend to

shoot Lorenzo Warren, regardless of his BAC.

In this vein, the central intoxication case the district court cites, *Miller v. Terhune*, 510 F. Supp. 2d 486 (E.D. Cal. 2007), is unavailing.[27]  First, the ineffectiveness of the defendant's attorney in *Terhune* was not limited to a failure to investigate—or to call an expert to testify about—the effect of the defendant's intoxication, but rather included a failure even to seek an intoxication instruction or pursue an intoxication-based defense in the first place.  *See id.* at 491, 502. Here, the jury *was* instructed on intoxication and Simons argued the point in his summation, yet the jury still voted to convict.  Second, in *Miller*, the expert that defense counsel could have called clearly opined that the defendant's cognitive

---

[27] The remaining cases Waiters cites in his appellate brief on this issue are also unpersuasive because the circumstances at issue in those cases bear little resemblance to those at issue here.  *See Cox v. Donnelly*, 387 F.3d 193, 197–99 (2d Cir. 2004) (ineffective assistance for failure to object to unconstitutional intent instruction); *Davis v. Strack*, 270 F.3d 111, 131–32 (2d Cir. 2001) (violation of due process stemming from failure to provide justification charge); *Lindstadt*, 239 F.3d at 194, 199–205 (finding, in a case of "underwhelming evidence," that defense counsel's "ineffectiveness"—(a) failure to identify a clear factual discrepancy that would have provided "something akin to an alibi"; (b) failure to effectively challenge "the only physical evidence" of the defendant's crimes; (c) an opening statement which "assured that, before [the defendant] opened his mouth to testify, he admitted that the prosecution has made its case"; and (d) failure to make an "obvious point" that demonstrated the relevance of the testimony of two probation officers, the only witnesses who could corroborate the defense—was prejudicial).

abilities were sufficiently impaired to negate his intent to kill, *id.* at 491, 504–05, whereas here Dr. Stripp refused to draw any such conclusion.

In short, we cannot say that the state trial court's ruling—that Waiters's defense was not prejudiced by Simons's conduct—was objectively unreasonable. This is not a case where Dr. Stripp's testimony and the full medical records would have so clearly "alter[ed] the entire evidentiary picture" that the trial court's decision is indefensible. *Strickland*, 466 U.S. at 696. Rather, the strong evidence of intent here places the trial court's ruling firmly within the bounds of "fairminded disagreement." *Richter*, 562 U.S. at 103. Therefore, in light of the deferential standard of review, we conclude that the district court erred in granting Waiters's petition.

\* \* \*

With respect to the other grounds for habeas relief that Waiters identifies, namely Simons's alleged failure to (a) ask that the jury be charged on second-degree manslaughter, and (b) impeach Warren with prior inconsistent statements, we do not address them here because the district court did not consider them below. *Cf. DiSimone v. Phillips*, 461 F.3d 181, 198 (2d Cir. 2006) (remanding habeas case for consideration of a question that had "not to date

40

been the focus of attention in the courts that . . . reviewed [the defendant's] case"); *United States v. Tarricone*, 21 F.3d 474, 476 (2d Cir. 1993) (refusing to consider ineffective assistance claim because the government introduced additional facts that the Court determined "should be evaluated by the district court in the first instance"). We instead remand so that the district court may consider the remaining aspects of Waiters's ineffective assistance allegations in the first instance, consistent with the analysis herein.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's grant of Waiters's petition for a writ of habeas corpus and REMAND the case for further proceedings consistent with this opinion.

**DENNIS JACOBS, <u>Circuit Judge</u>, dissenting:**

I respectfully dissent.

At a family gathering the morning after his birthday party, defendant General Waiters shot at the son of his girlfriend; but, shooting wildly, he wounded his target, hit three others, and killed two, including a toddler. He did this in a drunken rage. He is not entitled to much indulgence; but he was entitled to a fair trial. He did not get one because his counsel failed to arrange entry into evidence of a hospital record showing his blood alcohol at a potentially lethal level.

The United States District Court for the Eastern District of New York (Gleeson, <u>J.</u>) granted a writ of habeas corpus on the ground that defense counsel was constitutionally ineffective, that prejudice was established, and that the constitutional violation survives such deference as is owed to the rulings of the state court.

The two elements of ineffectiveness under the federal Constitution are deficient performance by counsel below and prejudice. The majority opinion goes on the assumption that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

1

Amendment," <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), but reverses anyway on the ground that the showing of prejudice is insufficient to withstand the deference we owe to state courts in habeas cases. Because I vote to affirm, I need to consider counsel's performance as well as prejudicial impact.

## I

Defense counsel failed to adduce the only effective evidence in support of the only defense that was pressed on summation. Waiters's only conceivable defense was lack of intent, and the only conceivable way he could show lack of intent was by alcohol impairment. The jury charge allowed the jury to consider the impact of alcohol on the question of intent; defense counsel on summation argued alcoholic impairment of intent; and the prosecution joined issue on that point at closing.

On the issue of intoxication, defense counsel held a largely bad hand. The impairment defense was undercut at trial by the defendant's girlfriend, whose family members were decimated by the gunfire. She testified that, on the morning of the shooting, she was drinking with him for half an hour but she could not say he had imbibed more than a single drink. Her son, whom Waiters

2

shot, testified that Waiters's words were "a little bit slurred," but also testified that he had seen Waiters "way worse" at least ten other times. This was the only testimony bearing on intoxication as the case went to the jury.

The only hope of the defense (and a potent one) was a hospital record showing that Waiters's blood alcohol content ("BAC") was .39--five times the legal limit for driving; indicative (for a person of defendant's 130 pounds) of sixteen drinks the morning of the shooting; and typically enough to cause "significant cognitive impairment" including "impairment on judgment," "blackouts," "amnestic effects" and "potentially even unconsciousness." App'x at 81. And death. This was no mere incremental detail; it was powerful evidence of an otherwise forlorn defense.

But defense counsel inexplicably never played that trump card. He did attempt to enter into evidence the defendant's post-shooting hospital records, but the state trial court allowed in just two lines of them, and excluded the BAC number on the (valid) ground that expert testimony was needed to explain what it meant. The court was more than happy to give defense counsel time to find an expert to introduce and explain the BAC record, and everyone in the courtroom (except defense counsel) seemed to appreciate the import of that evidence: the

3

state trial judge repeatedly urged defense counsel to call an expert to introduce it, and the prosecution was willing to adjourn to allow the defense to find an expert. See infra at 14-15. Defense counsel dug in. When the court informed him that it would not allow the BAC information in unless he called an expert, defense counsel told the court he would not call any more witnesses.

Thus the state trial court allowed into evidence just two lines of the medical records, both of which blandly observed that Waiters was "intoxicated." Neither line included the BAC level, and neither line could answer the crucial question of whether Waiters's intoxication was sufficient to impair intent. Defense counsel seemed not to understand how much more significant the .39 BAC was than the reference to his client as "intoxicated": in the evidentiary colloquy with the state trial judge, he failed to zero in on that number; and at the post-conviction hearing, he would not agree that it signified that Waiters had been "very drunk." App'x at 129.

Unsurprisingly, the prosecutor's closing statement on the intoxication defense focused on problems that would have been resolved by the BAC record. See infra at 9-10.

4

The refusal by defense counsel to introduce his only powerful piece of evidence is simply unaccountable. At trial, he offered no explanation. He seems not to have discussed the issue with his client before or during the evidentiary colloquy. At the hearing to vacate Waiters's conviction under New York Criminal Procedure Law § 440.10, conducted by the same state trial judge, defense counsel could not recall why he let pass the offered opportunity to call an expert. A pity: I would be deeply curious to know.

Without deciding the adequacy of counsel's representation, the majority nevertheless posits several reasons why a lawyer might do what defense counsel did here. None of it washes. It is true that cross-examination of the expert would elicit the concession that Waiters probably built up resistance by long-term alcohol abuse. But every piece of evidence is subject to cross-examination and attack. As Judge Gleeson observed:

> No reasonable defense attorney would opt to keep the jury ignorant of Waiters's astronomically high BAC on the off chance that it might not be astronomical enough . . . Trial counsel's decision simply was not a tactical choice; it was incompetence.

App'x at 20, 22.

The majority also speculates that defense counsel may have been afraid to ask for an adjournment because that would have given the prosecution time to

5

seek additional evidence of Waiters's intent. But the majority does not extend

that speculation to come up with any particular piece of evidence the prosecution

might have sought out. I can't come up with one either.

The majority opinion further posits that the expert testimony might open

the door to statements Waiters made to psychological evaluators, in which he

denied that he had been drunk at the time of the shooting (and the state trial

judge made a similar point).[1] But the effect of the admissions is easy to discount.

Many drunks profess perfect sobriety, and no rational juror would credit an

individual's statement that he was sober over scientific evidence that he had

sixteen drinks in the prior hour.


**II**

The majority opinion relies solely on its conclusion that the showing of

prejudice was insufficient even to establish a "reasonable probability" that the

---

[1] After the post-trial hearing, the state trial court noted that introducing the .39 BAC into evidence would be inconsistent with Waiters's own protestations that he was sober the morning of the shooting. It may be that a defense lawyer is not obligated to argue an intoxication defense when his client denies being drunk; but once defense counsel chooses to argue a defense (and intoxication was the only defense he argued on summation), he has an obligation to do so effectively.

outcome would have been different--i.e., that the jury might have acquitted, or hung, or convicted on a lesser charge, <u>Strickland</u>, 466 U.S. at 695--and that in any event we owe deference to the state trial court's ruling after the post-trial hearing.

Consider how the prosecution would fare in this case if it had withheld from the defense a document showing that, one hour after the shooting, the defendant had enough alcohol in his blood to kill a normal person. The prejudice would be seen as obvious and the effect palpable.

As a matter of law, the result here can be no different. The standard for gauging prejudice in a case of ineffectiveness is derived from <u>Brady</u>, 373 U.S. 83 (1963); and the Supreme Court has told us that the standard for assessing prejudice is the same in <u>Brady</u> claims as in claims for ineffectiveness.[2] Tellingly, the majority opinion does not assert that it would reach the same finding on prejudice if the <u>Strickland</u> and <u>Brady</u> standards were the same. Instead

---

[2] <u>Compare</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 289 (1999) (holding that prejudice under <u>Brady</u> requires a "'reasonable probability' that the result of the trial would have been different") <u>with</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984) (explaining that the test for prejudice in ineffective assistance claims is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and that the prejudice test in ineffectiveness cases "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution").

(proceeding by footnote), the majority opinion agrees that the <u>Strickland</u> standard derives from the <u>Brady</u> standard and uses the same words, but holds that the two standards are somehow different. In doing so, it cites no relevant law, and splits from published decisions by every other circuit in the country.[3]

---

[3] <u>See Ruiz v. United States</u>, 339 F.3d 39, 43 (1st Cir. 2003) ("<u>Brady</u> claims are subject to the same prejudice requirement as ineffective-assistance claims"); <u>Marshall v. Hendricks</u>, 307 F.3d 36, 85 n.37 (3d Cir. 2002) ("the <u>Strickland</u> prejudice standard is the same as the <u>Brady</u> materiality standard"); <u>United States v. Higgs</u>, 663 F.3d 726, 735 (4th Cir. 2011) ("[t]he standard for <u>Strickland</u> prejudice is the same as for <u>Brady</u> materiality"); <u>Felder v. Johnson</u>, 180 F.3d 206, 214 (5th Cir. 1999) ("the standard for prejudice under <u>Strickland</u> is identical to the standard for materiality under <u>Brady</u>" (internal quotation marks omitted)); <u>Moreland v. Robinson</u>, 813 F.3d 315, 330 (6th Cir. 2016) ("<u>Strickland</u> and <u>Brady</u> claims use the same 'reasonable probability' standard to assess prejudice"); <u>Harris v. Thompson</u>, 698 F.3d 609, 645 (7th Cir. 2012) ("[w]hen a defendant is deprived of favorable evidence, the same 'reasonable probability' standard applies to determining materiality under <u>Brady</u> and . . . to determining whether the accused was prejudiced for the purposes of <u>Strickland</u>"); <u>Clay v. Bowersox</u>, 367 F.3d 993, 1000 (8th Cir. 2004) ("[t]he materiality standard under <u>Brady</u> is the same as the prejudice standard under <u>Strickland</u>"); <u>United States v. Olsen</u>, 704 F.3d 1172, 1187 (9th Cir. 2013) ("<u>Brady</u> materiality and <u>Strickland</u> prejudice are the same"); <u>Romano v. Gibson</u>, 239 F.3d 1156, 1172 (10th Cir. 2001) ("<u>Brady</u>'s prejudice inquiry is equivalent to the prejudice analysis that applies to an ineffective assistance of counsel claim under <u>Strickland</u>"); <u>Jennings v. McDonough</u>, 490 F.3d 1230, 1243 (11th Cir. 2007) ("[t]he prejudice prong of <u>Strickland</u> incorporates the same standard used for assessing the materiality of evidence under <u>Brady</u>"); <u>United States v. Baxter</u>, 761 F.3d 17, 24 n.4 (D.C. Cir. 2014) (citing <u>Montgomery v. Bobby</u>, 654 F.3d 668, 679 n. 4 (6th Cir.2011) for the proposition that "[i]t is well settled that the test for prejudice under <u>Brady</u> and <u>Strickland</u> is the same.").

8

Applying the Strickland standard (as derived from Brady), prejudice is clear because the evidence that Waiters had absorbed a potentially lethal intake of sixteen drinks was the vital corrective to Warren's testimony that she had seen him have only one drink that morning in about half an hour. It is easy to conclude here, as we would in a Brady case, that the evidence the jury never got to see would have "alter[ed] the entire evidentiary picture," such that acquittal was at least reasonably probable. Strickland 466 U.S. at 696.[4]

This was not lost on the prosecutor. In summation, the prosecution recalled testimony that one victim smashed an aquarium over Waiters's head, and discounted the hospital note that Waiters was "intoxicated" with the rhetorical question:

> How are you able to tell intoxication from the effects of getting hit over the head with a fish aquarium? Who knows?

---

[4] Waiters argues that his counsel was also ineffective for failing to impeach Warren on a crucial point. Her testimony that Waiters had had only one drink could have been impeached with her prior statement to the defendant's investigator that Waiters drank a pint of liquor by himself that morning. "In evaluating prejudice, we look to the cumulative effect of all of counsel's unprofessional errors," and that error can only exacerbate the existing prejudice. Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005). The mandate in this case, which vacates and remands for consideration of this claim of ineffectiveness (and another), therefore leaves open the way to an ultimate ruling on remand that Waiters's counsel was ineffective and that prejudice resulted.

Supp. App'x at 86-87. *"Who knows?"* The prosecutor knows. He knew that the excluded BAC information would establish not only that the impairment was due to alcohol, but that Waiters was so intoxicated he could have fallen over dead.

The majority opinion advances two arguments to discount the possibility of an acquittal even if the BAC record had been allowed into evidence with an expert explanation. First, the majority opinion claims that the jury was "well aware . . . that [Waiters] was intoxicated when he emptied his revolver in the direction of Warren's family." Maj. Op. at 33. A review of the record shows that there was actually very little evidence of Waiters's intoxication before the jury when it went to deliberate. His girlfriend testified that her fight with Waiters began when she told him he had too much to drink, but (as set forth above) she also testified that she did not know whether he had more than one drink that morning, and her son testified that, though Waiters's words were "a little bit slurred," he had seen Waiters "way worse" at least ten other times. The only other evidence of intoxication was the two lines in the medical records saying that Waiters was "intoxicated." But the prosecutor effectively attacked that

10

medical evidence as unreliable and imprecise in his closing statement.  See supra at 9-10.

None of that evidence would persuade a jury that Waiters was *extremely* intoxicated, as required for an intoxication defense.  None of it has anything like the force of the BAC record, which (with an expert explanation) would prove that the 130-pound defendant must have had sixteen alcoholic drinks that morning before the shooting started.

The majority opinion also considers that there was scant hope for an intent defense because Waiters did a number of voluntary acts that show self-possession: he bought milk and cereal; he got the gun; he concealed it on his person; he taunted his target with having it.  But when he then shot, he barely wounded the target with whom he stood face to face, and he accidentally shot three others, two of them fatally.  In other words, the evidence that Waiters was sober enough to act with intent was vulnerable.

The evidence of intoxication that the jury saw did not approach the level deemed necessary in the jury charge (as set out in the margin).[5]  A jury that had

---

[5] Supp. App'x at 88:

the most powerful evidence in Waiters's favor--a jury that knew he had a .39

BAC and that was told what that meant--could easily conclude that he was

profoundly under the influence, and had a diminished ability to form the

requisite intent.[6]


### III

The majority opinion is understandably reluctant to hold on the merits that

it was not at least "reasonably probable" that evidence of the defendant's

---

"Now, jurors, under our law, intoxication is not as such a defense to a
criminal charge. But evidence of the defendant's intoxication may be
considered by you whenever it is relevant to negative an element of the
crime charged.

"So, in determining whether the defendant had the intent necessary to
commit a crime, you may consider whether the defendant's mind was
affected by intoxicants to such a degree that he was incapable of forming
the intent necessary for the commission of any of the crimes charged that I
just submitted to you."

[6] The majority opinion also cites several New York state cases on the
intoxication defense. None of them is relevant. The question here is not
sufficiency of the evidence or entitlement to an intoxication charge; it is whether
there is a "reasonable probability" that--if an expert had explained to the jury
what a .39 BAC meant--the jurors would have convicted on the lesser charge, or
acquitted, or hung. Strickland, 466 U.S. at 694.

prodigious intake might have changed the guilty verdict. Instead, the majority opinion leans on the concept of deference.

First, it is of course true that ineffectiveness claims generally involve deference. But the deference due under Strickland is deference to the tactical choices made by defense counsel--the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. That goes to the "ineffectiveness" prong of Strickland, not to prejudice. Since the majority opinion punts on ineffectiveness and relies solely on prejudice, Strickland deference thus does no work for it. See Hardy v. Chappell, 849 F.3d 803, 825 n.10 (9th Cir. 2016); Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1334 (11th Cir. 2013) (Jordan, J., concurring) ("[it] makes no sense to say that initial judicial review as to whether prejudice resulted from counsel's deficient performance--on its own, before adding AEDPA deference--involves any deference").[7]

---

[7] The majority goes as far as is prudent in suggesting (without holding) that "double deference" may be owed as to prejudice, i.e., deference (uncontroversially) to the trial court as well as deference (oddly) to the defense counsel. But I concede there is a circuit split on this, and that some other courts have made the same error.

13

Nor can the majority rely on deference to the state trial judge under AEDPA. The views of the trial judge are best manifested by her several efforts to focus defense counsel on the need to get an expert to give the testimony that would make admissible medical records containing the crucial .39 BAC. The judge went as far as she could go without committing advocacy:

> THE COURT: I would agree with [the prosecutor] that the best way would have been to get someone from the hospital to certainly interpret the records as to those limited issues. Quite frankly, I don't know why, you know, someone wasn't called or at the very least to get an assessment by the doctor who appeared, even if it was by the people, something that would assist.
>
> THE PROSECUTOR: Well, I'm not in a position of assisting [the defendant] your Honor.
>
> THE COURT: I understand that. Nor should you be. But I'm saying that [expert testimony] is possibly one way that it could have been rectified.
>
> THE PROSECUTOR: My position is it's the only way, your Honor.
>
> What is [defense counsel] going to get up there and say? That this level means something? That this person's observation is any better than any other person's observation? That one person's intox, what does it mean in a medical standpoint? Does it mean that he can't form intent? I mean, this is all going to be speculation. What's he going to do, testify? Then it becomes impossible for me to rebut. Nor should I have to.
>
> Again, you say it might be the better course. We're still not under a time crunch here, Judge. It can be done.
>
> []

14

THE COURT: So, if you're seeking to have blood levels, the amount of ethanol alcohol in Mr. Waiters's blood stream, then clearly there should be someone to explain it for the edification of the jury as to what, in fact, that would mean. Otherwise, there's no point to seek to introduce those levels of ethanol alcohol in his blood stream.

DEFENSE COUNSEL: Your Honor, the defense at this point is not introducing any additional witnesses at this point.

We would request that the Court permit all the information in, and we're prepared for the Court to make its ruling based on the defense not presenting any additional witnesses at this time.

THE COURT: May I see counsel at sidebar. (Off-the-record discussion held at the bench.)

It's the Court's understanding that the defense is not going to be calling any medical witness in order to certainly enlighten the jury as to what the numbers mean contained in the medical records.

Supp. App'x 68-69, 71-72.

The majority opinion relies on the post-hearing conclusion of the state trial judge. She expressed her conclusion in a single clause, which does not help the majority at all:

[T]here is a little doubt the claims raised by the defendant would have served to change the jury's verdict.

App'x at 56. That sentence is best read to reflect that the trial judge declined to rule on prejudice; after all, given her holding that defense counsel was effective,

15

she did not need to decide prejudice.  The majority opinion, however, urges that this sentence is afflicted by a pair of typographical errors: if the indefinite article "a" is removed and the little word "not" is inserted at a likely spot, the finding would coincide with the view of the majority opinion.  (The majority opinion justifies its rewrite on the ground that the state habeas opinion--to which it urges deference--is full of typos.)  I think it is possible that the state trial judge did intend to say the opposite of what she wrote.  The context is ambiguous.  But surely it is odd to rewrite a sentence that is grammatically sound in order to make it say something else for the purpose of giving it deference.

Finally, AEDPA deference does not mean that we use the rubber stamp. When a state court decision is unreasonable, we may grant habeas relief. Rompilla v. Beard, 545 U.S. 374, 380 (2005).  So even if the state court had held that there was no sufficient prejudice in this case, that decision would have been unreasonable for reasons I need not repeat.

* * *

Defense counsel pursued an intoxication defense, but failed to introduce and explain evidence that his 130-pound client had sixteen alcoholic drinks

16

before committing the crime.  He never provided a reason for his omission, and none is conceivable.  It is at least reasonably probable that a jury, hearing such potent evidence, would develop reasonable doubt as to the element of intent.